**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Integrity Business Partners, LLC,

        Plaintiff,                                 Case No. 1:21-cv-162

v.                                            Judge Michael R. Barrett

Autumn Ridge Consulting Inc., et al.,

        Defendants.

**<u>OPINION & ORDER</u>**

This matter is before the Court on the Motion for Preliminary Injunction filed by the 15 corporate Counterclaim-Plaintiffs (collectively, "Sub-Merchants") and one individual Counterclaim-Plaintiff, Gina Stagnitto ("Stagnitto"). (Doc. 21). Counterclaim-Defendant Integrity Business Partners, LLC ("IBP") filed a Response in Opposition. (Doc. 33). Sub-Merchants and Stagnitto filed a collective Reply. (Doc. 44). The Court held oral argument on the matter. (Doc. 52). Following Court-ordered expedited discovery,[1] Sub-Merchants and Stagnitto filed a collective Supplemental Brief (Doc. 75), and IBP filed a Response in Opposition (Doc. 83).

## I. **<u>BACKGROUND</u>**[2]

This case is about money spent via credit or debit card payments between August 21, 2020 and August 25, 2020 by customers at Sub-Merchants' online stores.

---

[1] In August 2021, the Court granted Sub-Merchants' and Stagnitto's Motion for Expedited Discovery and held their Motion for Preliminary Injunction in abeyance. (Doc. 60).

[2] For purposes of a motion for a preliminary injunction, "a party 'is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

Specifically, this case is about the exact amount of money Sub-Merchants' customers spent in card payments, what fees are properly deducted from that amount under the parties' various card payment processing contracts, to whom that money belongs, and who owes whom that money.

### a.  Card Payment Processing Services

To accept card payments, a business ("merchant") must first open an account for credit and debit card payment processing services. (Doc. 21-1 Xavier Ayala[3] Decl. ¶ 15). A merchant opens such an account by contracting with a member bank of Mastercard[4] or Visa[5] (collectively, "Card Brands"). (*Id.*) Such member banks also have contracts with Card Brands that enable member banks to process credit and debit card payments for contracting merchants. (*Id.*) This process, on the merchant end of card payments, is called "acquiring," and the banks are often referred to as "acquirers." (*Id.*)

Acquirers, in turn, may also contract with third party organizations ("service providers") to provide card payment processing related services ("program services") to merchants under the acquirers' sponsorships with the Card Brands. (*Id.* ¶¶ 17-18). The Card Brands categorize service providers based on the nature of the program services performed. (*Id.* ¶ 18). For instance, an acquirer may sponsor a service provider as an Independent Sales Organization that would solicit merchants for payment processing services on the bank's behalf. (*Id.*) Or, as another example, an acquirer may sponsor a service provider as a Payment Facilitator ("PayFac") that would directly contract with sub-

---

[3] Ayala is an expert on custom and practice in the electronic payments industry. (Doc. 21-1 Ayala Decl. ¶ 3).

[4] Mastercard International Inc.

[5] Visa Inc.

merchants[6] as an acquirer's agent and give the acquirer records of valid transactions submitted to the PayFac by its sub-merchants. (*Id.*)

A service provider may perform only the type of program service that it is registered to perform on behalf of the particular acquirer that sponsored its registration. (*Id.* ¶ 20). A service provider must be registered with the Card Brands to perform the type of program service before an acquirer or merchant may use its services. (*Id.*) Moreover, a service provider must be contractually bound to comply with the rules and regulations of the credit card brands, *e.g.*, Visa and Mastercard, ("Card Brand Rules")[7] as a condition to its sponsorship by an acquirer. (*Id.* ¶ 21).

Card Brand Rules generally prohibit service providers from having any access, directly or indirectly, to any account for funds due to a merchant and/or funds withheld from a merchant for chargebacks[8] arising from, or related to, performance of a contract with a merchant. (*Id.* ¶ 24). For example, while an Independent Sales Organization may make recommendations to the acquiring bank about how to handle merchant funds, the acquiring bank must directly collect and control such funds. (*Id.*)

---

[6] Because a PayFac has a "master merchant account" with its acquiring bank, the individual business owners are called "sub-merchants." (Doc. 21-1 Ayala Decl. ¶¶ 22-23).

[7] One of the primary purposes of the Card Brand Rules is to ensure compliance with government and regulatory rules, including Bank Secrecy Act/Anti-Money Laundering regulations. (Doc. 21-1 Ayala Decl. ¶ 32).

[8] A chargeback is a charge that is returned to a customer's payment card after a customer successfully disputes an item on their account statement or transactions report. (*Id.* ¶ 37). Typically, after a customer successfully disputes an item, the acquirer must return the funds to the card-issuing bank, and debits the amount of the chargeback from the merchant's reserves, if available, or from the merchant's deposit account, and also assesses a contractually agreed-upon chargeback fee, *e.g.*, $35.00. (*Id.*)

However, unlike other service providers, Card Brand Rules permit a properly registered PayFac to handle sub-merchant funds. (*Id.* ¶ 25). An acquirer may directly pay or credit a properly registered PayFac on behalf of a sub-merchant; however, that PayFac must then pay each sub-merchant for all transactions the PayFac submits to its acquirer on the sub-merchant's behalf. (*Id.*) More specifically, and returning to the PayFac/sub-merchant relationship generally, a PayFac would open a merchant bank account and receive a master merchant identification number ("MID") to acquire and aggregate payments for a group of smaller merchants, *i.e.*, sub-merchants. (*Id.* ¶ 22). The PayFac would have an embedded payment system and register their master MID with an acquiring bank. (*Id.*) Sub-merchants, on the other hand, are not required to register their unique MIDs and, instead, sub-merchants' transactions are aggregated under the PayFac's master MID. (*Id.*) This aggregation is meant to reduce the complexity that sub-merchants would otherwise face when setting up online payments on their own. (*Id.*) The PayFac would submit the transactions of all of its sub-merchants for processing through its master MID with its acquiring bank and track the allocation of all of these transactions and the resulting proceeds through sub-accounts on the PayFac's own systems. (*Id.* ¶ 23).

### b.  The Parties

Sub-Merchants are online businesses that market digital products[9] and require the ability to accept card payments over the Internet to conduct business. *See* (Doc. 35 Raymond Zak Aff. ¶ 2).

---

[9] *E.g.*, online arcade games, online brain games, online e-books, and digital fitness programs. (Doc. 90 PageID 2613-2827).

Stagnitto provides business-consulting services to each of the Sub-Merchants, introduced each Sub-Merchant to IBP, and acted as the Sub-Merchants' primary point of contact with IBP in their respective payment processing relationships. (Doc. 21-2 Gina Stagnitto Decl. ¶ 2).

Fifth Third Bank ("Fifth Third") is a member bank that provides credit and debit card payment processing acquiring services through Worldpay, LLC ("Worldpay"). (*Id.* ¶ 3). Worldpay was formerly named Vantiv, LLC. (*Id.*)

IBP works with online businesses to provide card processing services. *See* (Doc. 35 Zak Aff.). Raymond Zak is the CEO of IBP. (*Id.* ¶ 1). IBP contracted with each Sub-Merchant, and those contracts state that IBP would be acting in the capacity of a PayFac, under the sponsorship of Vantiv LLC (now Worldpay) as the acquirer and Fifth Third as the member bank. *See, e.g.*, (Doc. 3 ¶ 22); (*id.* Ex. A PageID 345-50); (Doc. 90 Counterclaim Ex. A PageID 2613-2827). IBP had approximately 200 sub-merchants, including the 15 Sub-Merchants in this matter, in its PayFac portfolio with Worldpay and Fifth Third. (Doc. 21-1 Ayala Decl. ¶ 23).

### c.   Agreements Between the Parties

In September 2019, IBP and Worldpay entered into a Payment Facilitator Merchant Agreement under which IBP obtained a PayFac registration and master merchant account and MID from Worldpay. (Doc. 3 ¶ 20); *see* (Doc. 37). IBP was then able to use its PayFac registration to aggregate payment transactions from sub-merchants—including but not limited to Sub-Merchants—in IBP's master merchant account with Worldpay. *See, e.g.*, (Doc. 21-1 Ayala Decl. ¶¶ 22-23, 25).

Between May 2020 and June 2020, each Sub-Merchant completed an

IBP Merchant Application for card payment processing services with IBP. (Doc. 21-2 Stagnitto Decl. ¶¶ 2-3); (Doc. 90 Counterclaim Ex. A PageID 2613-2827). Each IBP Merchant Application (1) incorporates by reference the IBP Terms of Service and (2) provides that the IBP Merchant Application and the IBP Terms of Service "together make up the Merchant Processing Agreement." (Doc. 90 Counterclaim Ex. A PageID 2613-2827).

The IBP Terms of Service is a document that consists of related agreements, including the IBP Sub-Merchant Agreement and the Merchant Services Agreement for Sub-Merchants. (Doc. 3 Ex. A PageID 345-359). The IBP Sub-Merchant Agreement— part of the IBP Terms of Service and thus the Merchant Processing Agreement—states that IBP is acting in the capacity of a PayFac to provide the payment processing services that are the subject of the Merchant Processing Agreement. (*Id.* PageID 345). Each Sub-Merchant and IBP are parties to the respective IBP Sub-Merchant Agreements. (Doc. 3 ¶ 22); (Doc. 90 Counterclaim ¶ 122 PageID 2593).

Under each Merchant Processing Agreement—that, again, contains an IBP Sub-Merchant Agreement—IBP and each Sub-Merchant agreed that IBP would set aside 10% of the individual Sub-Merchant's gross sales transaction proceeds as "reserves" to secure the Sub-Merchant's financial obligations to IBP under the contract and protect IBP against the risk of loss in connection with the Sub-Merchant's processing activity, *e.g.*, related to chargeback activity and Card Brand fines. (Doc. 3 Ex. A PageID 346-47); (Doc. 90 PageID 2613-2827).

IBP created a total of 43 unique sub-merchant accounts under its merchant MID with Worldpay for the processing of Sub-Merchants' transactions. (Doc. 21-2 Stagnitto

Decl. ¶ 4). The 43 individual MIDs relate to 43 individual websites owned by the respective Sub-Merchants. (*Id.*) Between June 10, 2020 and August 24, 2020, Sub-Merchants submitted more than $4.155 million in gross sales transactions for processing through the 43 MIDs. (*Id.* ¶ 5).

### d. August 2020

On Monday August 24, 2020, Worldpay, without notice, shut down IBP's master MID, and held back all settlement proceeds from the prior days' processing. (*Id.* ¶ 6). IBP, as a result, was unable to fund Sub-Merchants for several days prior to August 24, 2020. (*Id.*) Also on August 24, 2020, IBP emailed each Sub-Merchant the following message:

> Dear Customers,
>
> We are aware of this past weekend's funding issues with some of our processing merchants and we are actively working with WorldPay to resolve them.
>
> We appreciate your patience and apologize for any inconvenience this may have caused. Thank you
>
> Sincerely,
> Integrity Business Partners

(*Id.* ¶ 7) (citing *id.* Ex. 12 PageID 715).

On Wednesday August 26, 2020, IBP emailed each Sub-Merchant the following message:

> Dear IBP Merchant,
>
> It has come to our attention over the past 2 days that we incurred a technical funding error with Fifth Third Bank in making our merchant's daily settlements & deposits.
>
> We are diligently working on the technical error and are hopeful to have this problem fixed forthwith. We will keep you informed on our progress.
>
> Thanks for your patience as we work diligently in repairing this technical

issue. . . .

Thank You,
-IBP Team

(Doc. 21-2 Stagnitto Decl. ¶ 8) (citing *id*. Ex. 13 PageID 718). Also on August 26, 2020, Worldpay served IBP notice that Worldpay would soon end services under the Payment Facilitator Merchant Agreement and establish a reserve account in accordance with that agreement. (Doc. 37).

A few days later, Worldpay seized and placed a total of $2,700,000.00 from IBP's FBO Account (*i.e.*, an account held for the benefit of IBP's various sub-merchants, a group that includes more than just Sub-Merchants) in a reserve account per the terms of the Payment Facilitator Merchant Agreement. (Doc. 35 Zak Aff. ¶ 6). Specific to Sub-Merchants, as of August 26, 2020, IBP and Worldpay held a total of $416,041.91 of Sub-Merchants' funds as reserves in a Merchant Reserve Account[10] (*i.e.*, an account held for the benefit of only Sub-Merchants in this case) *and* an additional $1,036,416.91 in net proceeds from Sub-Merchants' processing activity ("suspended funds") from August 21, 2020 through August 24, 2020. (Doc. 21-2 Stagnitto Decl. ¶ 17).

Towards the end of August 2020, Zak informed Stagnitto (1) that Worldpay terminated the Payment Facilitator Merchant Agreement with IBP; (2) Worldpay then seized both the reserves of all the sub-merchants in IBP's portfolio *and* the last few days of processing activity funds from of all the sub-merchants in IBP's portfolio; and

---

[10] Under each Merchant Processing Agreement—that, again, contains an IBP Sub-Merchant Agreement between IBP and each Sub-Merchant—the parties agreed that IBP would deduct its agreed upon fees and withhold 10% of the transaction proceeds as rolling reserves to be maintained in a Merchant Reserve Account. *See, e.g.*, (Doc. 90 PageID 2617). Under each Merchant Processing Agreement, IBP and the individual Sub-Merchants agreed that "[t]he balance of the reserve account, if any, will be eligible for release to Merchant up to 180 days after termination of the M[erchant Processing Agreement] or Merchant's last transmission of sales drafts, whichever is later." *See, e.g.*, (*id*.)

(3) Worldpay continued to hold all of those funds. (*Id.* ¶ 9); *cf.* FED. R. EVID. 801(d)(2)(A) (an opposing party's statement, made by the party in a representative capacity, offered against an opposing party is not hearsay). And from late August 2020 forward, Zak repeatedly and consistently told Stagnitto that Sub-Merchants' funds remained in Worldpay's possession and that IBP and Worldpay would return the remaining balance of all Sub-Merchant funds to Sub-Merchants by February 26, 2021,[11] as that date would signify that the end of the risk of further chargeback[12] activity on the 43 individual MIDs. (Doc. 21-2 Stagnitto Decl. ¶ 11); *cf.* FED. R. EVID. 801(d)(2)(A).

### e. September 2020

Almost immediately after Worldpay terminated its Payment Facilitator Merchant Agreement with IBP, IBP began debiting Sub-Merchants' individual accounts for chargebacks, debiting a total of nearly $86,000.00 in the first week after the termination. (Doc. 21-2 Stagnitto Decl. ¶ 22). Stagnitto objected to this debiting, as she thought it not proper for IBP to withhold all of the suspended funds *and* continue debiting Sub-Merchants' deposit accounts. (*Id.* ¶ 23). In response this objection, Zak proposed that Stagnitto personally wire $100,000.00 to IBP as additional security, with the mutual understanding that Stagnitto's personal funds would be used only in the event that Sub-Merchants' reserves proved insufficient to cover Sub-Merchants' chargeback activity. (*Id.*

---

[11] February 26, 2021 is six months after August 26, 2020, the date on which Worldpay terminated its Payment Facilitator Merchant Agreement with IBP.

[12] It is common for e-commerce merchants, like Sub-Merchants, to experience a high number of chargebacks following the sudden termination of their individual MIDs, because the merchants are deprived of the ability to process refunds or returns, thereby impelling cardholders to initiate chargebacks. (Doc. 21-1 Ayala Decl. ¶ 37). On average, a cardholder has between 45 to 180 days to dispute a charge depending on the Card Brand. (*Id.*) Thus, it is commonly recognized in the payments industry that the acquiring bank faces little continuing risk of chargebacks 180 days, *i.e.*, approximately six months, post-termination of a merchant's account. (*Id.*)

¶ 24). Zak promised Stagnitto that wiring IBP the requested funds would both stop IBP from debiting Sub-Merchants' deposit accounts and help expedite the ultimate release of Sub-Merchants' reserves. (*Id.* ¶ 25); *cf.* FED. R. EVID. 801(d)(2)(A). On September 1, 2020, Stagnitto wired $100,000.00 of her personal funds to IBP with the understanding that those funds would be immediately returned to her as soon as the risk of chargebacks had passed. (Doc. 21-2 Stagnitto Decl. ¶ 25) (citing *id.* Ex. 16 PageID 732-33).

### f.  October 2020 to November 2020

On October 19, 2020, Zak emailed each Sub-Merchant to provide "some clarity surrounding the Worldpay shut down due to IBP being attached as collateral damage." (*Id.* ¶ 10) (citing *id.* Ex. 14 PageID 721). Zak stated that:

> Recently (August 2020), IBP was hit with collateral damage when Worldpay closed approximately 10 of their registered PayFac's without any prior notification. To say the least, this hit IBP as a complete surprise. Abruptly, our funding was shut down after a weekend of plentiful Sub-Merchant sales and Sub-Merchant's did not receive their Monday deposit as usual. Worldpay has continued to hold IBP & Sub-Merchant funds to this date without cause. Now, IBP understanding the Merchant landscape jumped into action and pre-funded merchants for that entire week as we worked tirelessly in moving these MIDS to other IBP Platforms.
>
> Additionally**, [ ] this situation was neither the fault of IBP, our Sub-Merchant's or Agents** . . .
>
>  . . .
>
> IBP has many direct ISO Platforms as we are registered with Wells Fargo Bank (TSYS & First Data) and Fifth Third Bank (ISO-Worldpay). *Our ISO-Worldpay is not effected by this closure as it's a completely separate book of business. This is our original ISO channel.* Not to mention that IBP continues to be registered as a PayFac with the card brands.
>
> Thanks for your continued trust in IBP and future business!

(*Id.* Ex. 14 PageID 721) (first emphasis added, second emphasis in original).

### g. December 2020 to February 25, 2021

Worldpay deregistered IBP as a PayFac with Mastercard on December 2, 2020 and deregistered IBP as a PayFac with Visa on December 14, 2020. (Doc. 21-1 Ayala Decl. ¶ 30). Consequently, from those dates forward, the Card Brand Rules prohibited IBP from handling Sub-Merchant funds, maintaining Sub-Merchant reserves, and/or paying Sub-Merchants directly. (*Id.*) Nevertheless, and unbeknownst to Sub-Merchants and Stagnitto until undertaking discovery in this matter, between December 7, 2020 and January 29, 2021—after IBP's de-registration as a PayFac—Worldpay transferred a total of $1,831,000.00—of the $2,700,000.00 in reserves seized from IBP's FBO Account—to IBP and retained a balance of $167,136.16 in IBP's FBO Account.[13] (*Id.* ¶ 31).

On January 6, 2021, in anticipation of the promised release of Sub-Merchants' funds by February 26, 2021, Stagnitto emailed Zak on Sub-Merchants' behalf and asked for a balance statement of all funds collectively due to Sub-Merchants. (Doc. 21-2 Stagnitto Decl. ¶ 13). IBP responded via email on February 2, 2021, and stated that IBP owed Sub-Merchants an alleged remaining, collective balance of $273,591.88. (*Id.* ¶ 14) (citing *id.* Ex. 11 PageID 713) ("IBP February 2021 Report"); *see* (*id.* Ex. 15 PageID 730). In a separate email, Zak confirmed that the alleged remaining balance of $273,591.88 did not include Stagnitto's $100,000.00. (Doc. 21-2 Ex. 15 PageID 728-29).

In reply, Stagnitto requested the return of her $100,000.00, as she stated that the risk of chargebacks stemming from purchased made between August 21, 2020 and August 25, 2020 was now over. (*Id.* PageID 727-28). Stagnitto and her colleagues also compiled a reconciliation of Sub-Merchants' processing history based on information

---

[13] Worldpay and Fifth Third have agreed to hold the balance of $167,136.16 in a segregated account pending the resolution of this case. (Doc. 21-3 Cebeci Decl. ¶ 11).

provided by IBP, and had Andrea Collver, an independent certified public accountant who specializes in merchant accounting, vet the report. (Doc. 21-2 Stagnitto Decl. ¶ 15) (citing *id.* Exs. 10-1 to 10-4 PageID 700-11) ("Sub-Merchant Reconciliation Report"); (Doc. 42-2 Andrea Collver Decl. ¶¶ 2-4). The Sub-Merchant Reconciliation Report determined that IBP owed Sub-Merchants an alleged remaining, collective balance of either $880,439.40 or $776,558.71, depending on whether IBP submitted and Worldpay settled a final batch of transactions for processing, a fact that was not clear based on the data that IBP provided to Sub-Merchants at that time. (Doc. 21-2 Stagnitto Decl. ¶¶ 18-19) (citing *id.* Exs. 10-1, 10-4 PageID 701, 711). Stagnitto emailed the Sub-Merchant Reconciliation Report to Zak on February 9, 2021. (Doc. 21-2 Stagnitto Decl. ¶ 21) (citing *id.* Ex. 10-1, 10-4 PageID 701, 711). Zak did not respond to that email. (Doc. 21-2 Stagnitto Decl. ¶¶ 21, 28).

On February 23, 2021, Sub-Merchants and Stagnitto's attorney emailed a demand letter to Zak demanding that IBP wire payment in the amount of $980,439.40 to his law firm's trust account by March 3, 2021 in exchange for a mutual release of claims against IBP. (Doc. 21-3 Bradley Cebeci Decl. ¶ 3) (citing *id.* Ex. 17 PageID 739-73). On February 25, 2021, Sub-Merchants and Stagnitto's attorney spoke with IBP's in-house counsel who stated that it appeared that IBP owed Sub-Merchants around $600,000.00, and he believed the parties "were close" for negotiating purposes. (Doc. 21-3 Cebeci Decl. ¶¶ 4-5); *cf.* FED. R. EVID. 801(d)(2)(D) (an opposing party's statement, was made by the party's agent on a matter within the scope of that relationship and while it existed, offered against an opposing party is not hearsay).

### h. Complaint and Counterclaims

Despite IBP's in-house counsel's statements regarding possible negotiations in lieu of litigation, on February 26, 2021, IBP filed the Complaint in this matter in the Court of Common Pleas for Hamilton County, Ohio. (Doc. 3). IBP's Complaint brings two claims: breach of contract and declaratory judgment against Sub-Merchants and Stagnitto. (*Id.*) IBP alleges that it is an Independent Sales Organization that, in September 2019, obtained a registered PayFac under Worldpay and Fifth Third to aggregate payment transactions from sub-merchants, including Sub-Merchants. (*Id.* ¶¶ 19-21). Contrary to Zak's message to Sub-Merchants in his October 2020 letter, IBP alleges that, in August 2020, Worldpay determined that suspicious activity was occurring on IBP's master merchant account with Worldpay and Fifth Third due to Sub-Merchants' activities. (*Id.* ¶¶ 24-25); *see* (Doc. 21-2 Stagnitto Decl. Ex. 14 PageID 721). IBP alleges that Sub-Merchants violated certain contracts and requests a declaration of rights under the various contracts in this matter. (Doc. 3 ¶¶ 32-37, 38-41).

On March 8, 2021, Sub-Merchants and Stagnitto removed the matter to this Court (Doc. 1) and filed an Answer to IBP's Complaint, a Counterclaim against IBP, and a Crossclaim against Worldpay and Fifth Third (Doc. 2). With respect to the Counterclaim against IBP, Sub-Merchants and Stagnitto brought six claims: breach of implied covenant of good faith and fair dealing, conversion, money had and received (constructive trust), violation of California Penal Code Section 496, and two claims for breach of contract. (*Id.* Counterclaim PageID 69-96 ¶¶ 1-138).[14]

---

[14] With respect to the Crossclaim against Worldpay and Fifth Third, Sub-Merchants brought four claims: breach of contract, breach of implied covenant of good faith and fair dealing, conversion, and money had and received (constructive trust). (Doc. 2 Crossclaim PageID 96-100 ¶¶ 139-63).

In response, IBP filed an Answer to the Counterclaim. (Doc. 27). Worldpay and Fifth Third filed a Motion to Dismiss the Crossclaim. (Doc. 26). Sub-Merchants and Stagnitto, in response to the Motion to Dismiss, filed their First Motion for Leave to File an Amended Counterclaim (Doc. 51). Sub-Merchants and Stagnitto subsequently filed a Second Motion for Leave to File an Amended Counterclaim. (Doc. 84).

The Court granted in part and denied in part the Second Motion for Leave to File an Amended Counterclaim and permitted Sub-Merchants and Stagnitto to bring nine counterclaims against IBP, Zak, and SimplePay,[15] and two counterclaims against Worldpay and Fifth Third. (Doc. 89). The nine counterclaims against IBP, Zak, and SimplePay are breach of implied covenant of good faith and fair dealing, conversion, violation of California Penal Code Section 496, piercing the corporate veil or alter ego, civil conspiracy, two counterclaims of breach of contract, and two counterclaims of money had and received (constructive trust). (Doc. 90 Counterclaim ¶¶ 1-210 PageID 2566-2612).[16]

### i.   Initial Disclosures

On May 3, 2021, IBP produced a second report of its processing activity related to Sub-Merchants. (Doc. 42-2 Collver Decl. ¶ 5) (citing (Doc. 42-1 Cebeci Supp. Decl. Ex. 20 ("IBP May 2021 Report") (SEALED))). Collver compared the IBP February 2021 Report, the Sub-Merchant Reconciliation Report, and the IBP May 2021 Report. (Doc. 42-2 Collver Decl. ¶ 6). After that comparison, she opined that the columns titled "reserves"

---

[15] SimplePay was incorporated in April 2021, and Zak is the sole shareholder of SimplePay. (Doc. 90 Counterclaim ¶ 117 PageID 2592).

[16] The two counterclaims against Worldpay and Fifth Third are breach of contract and breach of implied covenant of good faith and fair dealing. (*Id.* ¶¶ 185-98 PageID 2605-07).

on the IBP February 2021 Report and IBP May 2021 concern her and suggest that IBP is using a formula, rather than real numbers, to provide the reports' numbers. (*Id.* ¶ 8).

For example, the IBP February 2021 Report and IBP May 2021 Report each show the same number of sales transactions: 144,300. (Doc. 21-2 Stagnitto Decl. Ex. 11 PageID 713); (Doc. 42-1 Cebeci Supp. Decl. Ex. 20 (SEALED)). However, the IBP February 2021 Report reflects $4,155,330.37 in gross sales volume and a reported reserve of $416,041.92, while the IBP May 2021 Report reflects $3,973,730.57 in gross sales volume (*i.e.*, $181,599.80 less in gross sales volume based on the same sales activity), and a reported reserve of $405,243.34 (*i.e.*, $10,798.58 less in reserves than previously reported). *Compare* (Doc. 21-2 Stagnitto Decl. Ex. 11 PageID 713), *with* (Doc. 42-1 Cebeci Supp. Decl. Ex. 20 (SEALED)). And, of concern to Collver, the IBP May 2021 Report does not account for either the $181,599.80 in gross sales volume or the $10,798.58 in reserves that appear on the IBP February 2021 Report.

On August 25, 2021, and due in part to Collver's declaration, the Court granted Sub-Merchants and Stagnitto's Motion for Expedited Discovery and held their Motion for Preliminary Injunction in abeyance. (Doc. 60).

### j. Expedited Discovery

Sub-Merchants and Stagnitto's expedited discovery resulted in, inter alia, four important developments.

First, on September 15, 2021, IBP produced a third report of its processing activity related to Sub-Merchants. (Doc. 65-3 Andrea Collver Supp. Decl. ¶ 7) (citing (Doc. 71-1 Ex. 22 ("IBP September 2021 Report")). Collver compared the IBP February 2021 Report, the Sub-Merchant Reconciliation Report, the IBP May 2021 Report, and the

IBP September 2021 Report. (*Id.* ¶¶ 7-8) (citing (Doc. 71-2 Ex. 23)). After that comparison, she continued to opine that IBP is using a formula to provide the numbers to the parties in this matter. (*Id.* ¶ 8(e)). Collver also clarified that Sub-Merchants' final batch of transactions settled, a fact that was unclear when she compiled the Sub-Merchant Reconciliation Report. (*Id.* ¶¶ 9-16). With that information, she opined that Sub-Merchants are owed a total remaining balance of $880,145.58 stemming from the card payments placed between August 21, 2020 and August 25, 2020 on their respective websites. (*Id.* ¶¶ 8(i), 16).

Second, Sub-Merchants obtained additional details surrounding Worldpay and Fifth Third's transfer of the $1,831,000.00 to IBP.[17] Sub-Merchants learned the following details. Prior to August 24, 2020—the date Worldpay shut down IBP's master MID—IBP's FBO Account with Worldpay included *both* IBP's sub-merchants' reserves *and* net settled sales from IBP's sub-merchants' sales transactions. (Doc. 65-5 Raymond Zak Depo. PageID 1843-44). On August 24, 2020—again, the date Worldpay shut down IBP's master MID—IBP became unable to move funds out of the IBP FBO Account for any activity occurring on and after August 21, 2020. *See, e.g.*, (Doc. 75-1 PageID 2070-74). As of August 27, 2020, there was a total balance of $3,052,264.57 in IBP's FBO Account. (Doc. 70-1 SEALED). On August 28, 2020, Worldpay moved $2,700,000.00 of the $3,052,264.57 from IBP's FBO Account to a reserve account at Worldpay titled "Worldpay e-Commerce Reserve Account" per the terms of IBP and Worldpay's Payment Facilitator Merchant Agreement. (Doc. 70-1 SEALED).

---

[17] Again, this transfer took place after IBP's de-registration as a PayFac.

On December 7, 2020, IBP received a $831,000.00 deposit from the Worldpay e-Commerce Reserve Account into IBP's Operating Account at a different bank ("BBVA Operating Account"). (Doc. 71-4); *see* (Doc. 71-3 PageID 1926) (IBP's Resp. to Interrogatory Nos. 2 & 3) (explaining that IBP's BBVA Operating Account is the only account identified by IBP as having been used by IBP to receive any funds from Worldpay in connection with Sub-Merchants' processing activity). Later in the day on December 7, 2020, IBP transferred $830,500.00 from the BBVA Operating Account into IBP's BBVA checking account at that same bank ("BBVA Checking Account"). (Doc. 71-4); (Doc. 71-5 PageID 1937); (Doc. 71-6 PageID 1952).

On December 21, 2022, IBP transferred $805,000.00 from IBP's BBVA Checking Account to an account described as "DB Asset Group LLC" that is not one of IBP's bank accounts. (Doc. 71-6 PageID 1955). Zak testified that IBP did business with the "Dambach Brothers," *i.e.*, Gary Dambach and Todd Dambach, in that the Dambach Brothers referred "hundreds" of sub-merchants to IBP in the past. (Doc. 65-5 Zak Depo. PageID 1841). Zak testified that IBP attempted to partner with the Dambach Brothers to acquire commercial real estate in Florida and, in furtherance of IBP's attempt to acquire the real estate in partnership with the Dambach Brothers, IBP transferred the Dambach Brothers $805,000.00 from "IBP operating funds" to acquire a 10% ownership interest in the property. (*Id.* PageID 1841-42); (Doc. 71-7 PageID 2024) (IBP and Zak's June 6, 2021 demand for payment letter to the Dambach Brothers) (noting that, in December 2020, IBP and Zak "wired the sum of $805,000.00 to DB Asset Group LLC's account ending in *9341"). Zak testified that, despite IBP's transfer of $805,000.00 to DB Asset Group LLC, the real estate partnership between IBP and the Dambach Brothers was not successful,

17

and those parties are in separate litigation as a result. (Doc. 65-5 Zak Depo. PageID 1842); *see generally* (Doc. 71-7).

On December 29, 2020, IBP received a second deposit, this time of $500,000.00, from the Worldpay e-Commerce Reserve Account into IBP's BBVA Operating Account. (Doc. 71-5 PageID 1938). Later in the day on December 29, 2020, IBP transferred $500,000.00 from the BBVA Operating Account to IBP's BBVA Checking Account. (*Id.*); (Doc. 71-6 PageID 1957).

On January 29, 2021, IBP received a third and final deposit, also of $500,000.00, from the Worldpay e-Commerce Reserve Account into IBP's BBVA Operating Account. (Doc. 71-5 PageID 1941). Later in the day on January 29, 2021, IBP transferred $500,000.00 from the BBVA Operating Account to IBP's BBVA Checking Account. (*Id.*); (Doc. 71-6 PageID 1957).

In short, Sub-Merchants learned that Worldpay and Fifth Third transferred a total of $1,831,000.00, from the Worldpay e-Commerce Reserve Account into IBP's BBVA Operating Account, between December 7, 2020 and January 29, 2021, and during this same period, IBP transferred $805,000.00 from its "operating funds" to the Dambach Brothers for a real estate venture, albeit a failed one.

The third important development in expedited discovery relates to Stagnitto. She learned the following details. On September 1, 2020, IBP received the $100,000.00 in funds that Stagnitto wired to IBP into IBP's BBVA Operating Account. (Doc. 71-5 PageID 1929). Despite Zak's statement that IBP would only use Stagnitto's wired funds in the event that Sub-Merchants' reserves proved insufficient to cover Sub-Merchants' chargeback activity, by the end of September 2020, IBP's BBVA Operating Account had

18

a balance of $0.00. (Doc. 21-2 Stagnitto Decl. ¶ 24); (Doc. 71-5 PageID 1934).

Fourth, Sub-Merchants and Stagnitto learned that, as of August 31, 2021, IBP's BBVA Operating Account end-of-the-month balance was $21.88, and IBP's BBVA Checking Account end-of-the-month balance was $5,097.65.[18] (Doc. 71-5 PageID 1947); (Doc. 71-6 PageID 2020).

Finally, IBP has not transferred any of the $1,831,000.00 released by Worldpay and Fifth Third to IBP to Sub-Merchants (Doc. 42-1 Bradley Cebeci Supp. Decl. ¶ 5), and IBP has not returned Stagnitto's $100,000.00 (Doc. 21-2 Stagnitto Decl. ¶¶ 21, 28).

## II.   ANALYSIS

Pursuant to Federal Rule of Civil Procedure 65, a party may seek injunctive relief when it believes that it will suffer immediate and irreparable injury, loss, or damage. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In considering whether to grant a preliminary injunction, the court balances four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id.* (citation omitted).

---

[18] To the extent that Sub-Merchants and Stagnitto assert that IBP also has an account at BBVA ending in *9631 with a balance of $21.88 as of August 31, 2021 (Doc. 75 PageID 2068), it is not clear what, if any, relationship that account has to the disputed funds in this matter.

Sub-Merchants and Stagnitto seek a preliminary injunction ordering IBP to (1) identify all banks accounts into which IBP has received, deposited, or transferred any funds flowing from Sub-Merchants' payment processing activity from August 21, 2020 to August 25, 2020 and any portion of the $100,000.00 that Stagnitto advanced IBP in September 2020 and (2) *either* immediately freeze the identified accounts *or* immediately deposit $980,145.00[19] into the Court's registry. (Doc. 21 PageID 463-90); (Doc. 75 PageID 2064-65 n.6). IBP responds that Sub-Merchants cannot meet their burden under Rule 65 because factual disputes centered around the parties' contracts preclude Sub-Merchants from establishing a strong likelihood of success on the merits on any of their claims. (Doc. 33); (Doc. 83). IBP does not address Stagnitto's arguments. (Doc. 33); (Doc. 83). IBP also states that, if the Court grants the requested preliminary injunctive relief, then IBP will go out of business. (Doc. 33 PageID 883); (Doc. 83 PageID 2114).

Before turning to the four-factor preliminary injunction analysis, the Court agrees with Sub-Merchants and Stagnitto that it has the authority to issue the requested preliminary injunctive relief. (Doc. 21 PageID 481-82, 486-87) (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) (holding that—in an action solely for money damages stemming from a note, brought against a debtor by a creditor, and in which the creditor did not claim a lien or equitable interest in the debtor's assets— the district court lacked the authority to issue an asset-freezing injunction pending adjudication of creditor's contract claim for money damages, because such a remedy was historically unavailable from a court of equity)); *see U.S. ex rel. Rahman v. Oncology*

---

[19] This amount includes the remaining balance of $880,145.00 that Sub-Merchants allege is owed to Sub-Merchants for their processing activity for the relevant period and the $100,000.00 Stagnitto alleges is owed to her.

*Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999) (explaining that the Court in *Grupo Mexicano* "was not presented with, nor did it choose to address, a situation in which equitable remedies were claimed."); *see also Concheck v. Barcroft*, No. 2:10-CV-656, 2010 WL 4117480, at *2 (S.D. Ohio Oct. 18, 2010). IBP does not acknowledge the *Grupo Mexicano* holding or Sub-Merchants and Stagnitto's argument regarding that holding.[20] (Doc. 33); (Doc. 83); *cf. Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 626 (6th Cir. 2013) (holding that the injunction defendants forfeited any argument based on *Grupo Mexicano* on appeal, as they failed to cite *Grupo Mexicano* and present the argument thereon before the district court).

Additionally, the Court notes that Sub-Merchants request a Preliminary Injunction on the basis of their equitable claims for conversion and money had and received, and Stagnitto requests a Preliminary Injunction on the basis of her equitable request for the imposition of a constructive trust. (Doc. 21 PageID 482-86); (Doc. 21-4 PageID 762). The Court's jurisdiction to hear this case is based on diversity of citizenship.[21] IBP, Sub-Merchants, and Stagnitto stipulate that the Court should apply California substantive law to the entirety of its analysis regarding the Motion for Preliminary Injunction based on Sub-Merchants and Stagnitto's equitable claims. (Doc. 103); *cf.* (Aug. 18, 2022 Notation

---

[20] IBP's arguments in response to the request for preliminary injunctive relief focus entirely on the parties' breach of contract claims and counterclaims and ignore Sub-Merchants and Stagnitto's alternative counterclaims for equitable relief and the fact that the Motion for Preliminary Injunction focuses only on those counterclaims for equitable relief—counterclaims that IBP did not oppose when Sub-Merchants and Stagnitto moved for leave to amend their Counterclaim. (Doc. 33); (Doc. 83).

[21] The post-removal joinder of Fifth Third, an Ohio citizen, did not destroy diversity jurisdiction, as the parties in this matter remain diverse and the forum defendant rule applies only at the time of removal. *See Spencer v. U.S. Dist. Ct. for N. Dist. of Ca.*, 393 F.3d 867, 871 (9th Cir. 2004); *Gillett v. Spirit Com. Auto Risk Retention Grp., Inc.*, No. 3:19-CV-00260-RGJ, 2020 WL 5732155, at *3 (W.D. Ky. Sept. 24, 2020), *amended on reconsideration in part*, No. 3:19-CV-00260-RGJ, 2021 WL 27475 (W.D. Ky. Jan. 4, 2021); *cf.* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

ORDER).

### a. Likelihood of Success on the Merits

### i. Conversion (Sub-Merchants)

"Conversion is the wrongful exercise of dominion over the property of another."
*Lee v. Hanley*, 61 Cal. 4th 1225, 1240, 191 Cal. Rptr. 3d 536, 354 P.3d 334 (2015).
"[W]here a person entitled to possession [of the property] demands it, the wrongful,
unjustified withholding is actionable as conversion." *Piper v. Gooding & Co. Inc.*, 334 F.
Supp. 3d 1009, 1022 (D. Ariz. 2018) (citing *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138,
1145 (9th Cir. 2010)). Money can be the subject of an action for conversion only if there
is a specific, identifiable sum involved. *PCO, Inc. v. Christensen, Miller, Fink, Jacobs,
Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395, 58 Cal. Rptr. 3d 516, 524 (2007).
"California cases permitting an action for conversion of money typically involve those who
have misappropriated, commingled, or misapplied specific funds held for the benefit of
others." *Id.*, 58 Cal. Rptr. 3d at 525. The elements of a conversion claim in California "are:
(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's
conversion by a wrongful act or disposition of property rights; and (3) damages." *King v.
Facebook, Inc.*, 572 F. Supp. 3d 776, 791 (N.D. Cal. 2021) (quoting *Lee*, 191 Cal. Rptr.
3d 536, 354 P.3d at 334).

Here, with respect to the first element, Sub-Merchants argue that they have
ownership of the remaining balance of $880,145.00 for their collective sales transactions,
for the period between August 21, 2020 and August 25, 2020, that they submitted to IBP
after deducting all of the amounts owed to IBP, Fifth Third, and Worldpay under the
respective Merchant Processing Agreements. (Doc. 21 PageID 483); (Doc. 65-3 Collver

Supp. Decl. ¶¶ 8(i), 16). With respect to the second element, under the Card Brand Rules, IBP lost the right to handle, possess, or control any proceeds of Sub-Merchants' processing activity—including activity for the period between August 21, 2020 and August 25, 2020—when it lost its PayFac registration in December 2020. *See* (Doc. 21-1 Ayala Decl. ¶ 30). Nevertheless, between December 2020 and January 2021, and after IBP's de-registration as a PayFac, Worldpay and Fifth Third transferred and IBP accepted a total of $1,831,000.00, from the Worldpay e-Commerce Reserve Account into IBP's BBVA Operating Account. With respect to the third element, and despite Fifth Third and Worldpay's December 2020 and January 2021 transfers to IBP, IBP has not returned the $880,145.00 balance to Sub-Merchants. The Court finds that the evidence presented thus far establishes a likelihood of success on Sub-Merchants' claims for conversion against IBP. *See Kern Vineyards, Inc. v. AM Grp., Inc.*, No. 1:20-CV-00199-NONE-JLT, 2020 WL 3056436, at *6 (E.D. Cal. June 9, 2020), *report and recommendation adopted*, No. 1:20-CV-0199-NONE-JLT, 2020 WL 3491034 (E.D. Cal. June 26, 2020).[22]

### ii. Constructive Trust (Stagnitto)

In California, "[a] constructive trust is an equitable remedy that compels the transfer of wrongfully held property to its rightful owner." *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 908-09 (9th Cir. 2010), *as amended on denial of reh'g* (Oct. 21, 2010) (citing *Communist Party of U.S. v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 41 Cal. Rptr. 2d 618, 623 (1995)). "The wrongful act giving rise to a constructive trust need not amount to fraud or intentional misrepresentation. All that must be shown is that the acquisition of the

---

[22] As the Court finds that Sub-Merchants have shown a likelihood of success on their conversion claims, the Court need not and will not address the likelihood of success on Sub-Merchants' money had and received claims. *See Piper*, 334 F. Supp. 3d at 1022 n.7; *Jacobo v. Doe*, No. 1:22-CV-00672-DAD-BAK-BAM, 2022 WL 2052637, at *4 (E.D. Cal. June 7, 2022).

property was wrongful and that the defendant's keeping of the property would constitute unjust enrichment." *In re Goldberg*, 168 B.R. 382, 384 (B.A.P. 9th Cir. 1994). "A plaintiff seeking imposition of a constructive trust must show: (1) the existence of a *res* (property or some interest in property); (2) the right to that *res*; and (3) the wrongful acquisition or detention of the *res* by another party who is not entitled to it." *Mattel, Inc*, 616 F.3d at 909 (citing *Communist Party of U.S.*, 41 Cal. Rptr. 2d at 623-24).

Here, with respect to the first element, IBP's bank statement and Zak confirm that, on September 1, 2020, IBP received a total of $100,000.00 in funds that Stagnitto personally wired to IBP into IBP's BBVA Operating Account. (Doc. 32-1 Raymond Zak Aff. ¶ 5); (Doc. 71-5 PageID 1929). With respect to the second and third elements, Stagnitto likely has a right to the return of the $100,000.00 and IBP refuses to return that money. In particular, in August 2020, Stagnitto objected to IBP's immediate debiting of Sub-Merchants' deposit accounts for chargebacks after Worldpay terminated IBP's Payment Facilitator Merchant Agreement, and Zak proposed that Stagnitto personally wire $100,000.00 to IBP as additional security, with the mutual understanding that Stagnitto's personal funds would be used only in the event that the Sub-Merchants' reserves proved insufficient to cover Sub-Merchants' chargeback activity. (Doc. 21-2 Stagnitto Decl. ¶ 24); (Doc. 32-1 Zak Aff. ¶ 5). Zak promised Stagnitto that wiring IBP the requested funds would stop IBP from debiting Sub-Merchants' deposit accounts and expedite the ultimate release of Sub-Merchants' reserves. (Doc. 21-2 Stagnitto Decl. ¶ 25); *cf.* FED. R. EVID. 801(d)(2)(A). In February 2021, Stagnitto requested the return of her $100,000.00, as the risk of chargebacks stemming from purchases made between August 21, 2020 and August 25, 2020 would soon be over. (Doc. 21-2 Ex. 15). IBP

refused to return the $100,000.00, and IBP's bank statement confirms that, despite Zak's statement that IBP would only use Stagnitto's wired funds in the event that Sub-Merchants' reserves proved insufficient to cover Sub-Merchants' chargeback activity, by the end of September 2020—the same month that Stagnitto wired the funds to IBP—IBP's BBVA Operating Account had a balance of $0.00. (Doc. 21-2 Stagnitto Decl. ¶ 24); (Doc. 71-5 PageID 1934). The Court finds that the evidence presented thus far establishes a likelihood of success on Stagnitto's request for the imposition of a constructive trust.

### b. Irreparable Harm

Preliminary injunctive relief is available only if the movant can demonstrate that irreparable harm is likely in the absence of an injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Moreover, a party seeking an asset freeze and accounting "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Id.* at 1085.

Here, the Court finds a likelihood of irreparable harm to Sub-Merchants and Stagnitto in the absence of injunctive relief and a likelihood of dissipation of the claimed $880,145.00 to Sub-Merchants and $100,000.00 to Stagnitto. *See id.* The Court will not repeat the details surrounding Worldpay and Fifth Third's transfer of the $1,831,000.00 to IBP, but finds that Sub-Merchants have established the likelihood that, of the $1,831,000.00 transferred from the Worldpay e-Commerce Reserve Account into IBP's BBVA Operating Account between December 7, 2020 and January 29, 2021, and during this same period, IBP immediately transferred $805,000.00 from its "operating funds" to

the Dambach Brothers, for a real estate venture, instead of paying Sub-Merchants the $880,145.00 balance. *See supra* p. 16-18. Similarly, with respect to Stagnitto, on September 1, 2020, IBP received $100,000 from Stagnitto into IBP's BBVA Operating Account. (Doc. 32-1 Raymond Zak Aff ¶ 5); (Doc. 71-5 PageID 1929). IBP did not set these funds aside, as Zak promised IBP would do; rather, IBP left these funds in the BBVA Operating Account to be applied to IBP's operating expenses and, by September 30, 2020, that account had an ending balance of $0.00. (Doc. 21-2 Stagnitto Decl. ¶ 24); (Doc. 71-5 PageID 1934). Further, Zak informs the Court that IBP does not have the disputed fund balance in its account. (Doc. 83 PageID 2114). The Court is convinced, based on the evidence currently before it, that Sub-Merchants and Stagnitto have established the likelihood of irreparable harm supporting an asset freeze.

### c.  Substantial Harm to Others, and the Public Interest

A court must balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief, and should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Jacobo*, 2022 WL 2052637, at *5 (citing *Winter*, 555 U.S. at 22). Here, the Court finds that the balance of equities and public interest favor granting injunctive relief. Injunctive relief delays IBP from further dissipating funds and does not reach non-parties to this matter. *See id.; see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003))).

### d. Summary

Sub-Merchants and Stagnitto have shown a likelihood of success on the merits of their respective conversion claims and request for imposition of a constructive trust; Sub-Merchants and Stagnitto will likely suffer irreparable harm if IBP is able to continue to dissipate funds and assets thereby leaving Sub-Merchants and Stagnitto with no recovery; and the balancing of the equities and the public interest each weigh in favor of granting an injunction. Sub-Merchants and Stagnitto have met their burden for a preliminary injunction. *See Overstreet*, 305 F.3d at 573.

## III. <u>CONCLUSION</u>

For the foregoing reasons, it is hereby **ORDERED** that Sub-Merchants and Stagnitto's Motion for a Preliminary Injunction against IBP (Doc. 21) is **GRANTED.** Pursuant to Federal Rule of Civil Procedure 65, it is **ORDERED** that:

a. IBP **SHALL immediately** identify any and all bank accounts into which IBP (directly or through its officers, directors, related companies and/or affiliates) has received, deposited, or transferred any of Sub-Merchants' transaction proceeds or the $100,000.00 of Stagnitto's personal funds;

b. IBP **SHALL immediately** freeze all such identified accounts;

c. IBP **SHALL immediately** file Notice with the Court of its compliance with this Order as to those identified accounts;

d. IBP and its officers, agents, employees, and all persons in active concert or participation with it **ARE PROHIBITED** from debiting any fees or other charges from reserves or other unlawfully retained funds as described in this Order, or applying those reserves or other funds for any purpose

other than bona fide chargebacks or refunds;

**e.** The bond requirement set forth in Federal Rule of Civil Procedure 65(c) is **WAIVED**.[23] *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

**f.** This Preliminary Injunction **SHALL** become immediately effective upon entry.

**IT IS SO ORDERED.**

_/s Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court

---

[23] IBP did not respond to Sub-Merchants' request for waiver. (Doc. 33); (Doc. 83).